JODI LINKER
Federal Public Defender
Northern District of California
NED SMOCK
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: Ned_Smock@fd.org

Counsel for Defendant Kennieth MATTHEWS

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>KENNIETH MATTHEWS,<br>Defendant. | **Case Nos.:** CR 26-214 SI, 23-167 SI<br>**DEFENDANT'S SENTENCING MEMORANDUM** |

## INTRODUCTION

Kennieth Matthews has been a victim of multiple physical assaults and shootings, he has been diagnosed with PTSD, and he lives in constant fear of being victimized again. Several months after his February 2025 sentencing in his prior case before this Court, Mr. Matthews was again the victim of a horrifying attack at an event in Oakland when he was hit by multiple rounds from an assault rifle. He spent an extended period in the hospital and he continues to recuperate from the incident. In the aftermath of that shooting, Mr. Matthews made the ill-advised decision to obtain a firearm because he felt at the time that it was the only way he could remain safe in the community. He was arrested in this case after an incident when a man in a convenience store displayed a knife and Mr. Matthews in turn showed his firearm to ensure that the situation did not get out of hand. When law enforcement learned of the incident, they sought a warrant and Mr. Matthews was arrested in possession of the firearm.

Mr. Matthews is deeply disappointed to be back before this Court when he had been doing so well. He had been working, caring for his son, and taking positive strides for almost four years prior to this offense. Mr. Matthews accepted responsibility quickly and acknowledges that a custodial sentence is appropriate. He asks only that the Court take into account his history and the ways that his life experiences have impacted his behavior and decision making. The guidelines range is 21-27 months. Mr. Matthews is also facing sentencing on the probation violation associated with the charged conduct here. The government recommends a 27-month sentence, coupled with a concurrent 24 month sentence for the probation violation related to this offense. For its part, the defense proposes a sentence of 18 months custody, concurrent with an 18 month concurrent probation violation sentence.

## DISCUSSION

### I. A Sentence of 18 Months Imprisonment and Three Years of Supervised Release Would be Sufficient But Not Greater Than Necessary to Achieve the Sentencing Goals of § 3553(a)

Mr. Matthews does not object to the guidelines calculations set forth in the Presentence Investigation Report. The total adjusted offense level is 12 and Mr. Matthews' criminal history category is IV. The advisory guideline range in this case is 21-27 months. Criminal "punishment

should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). This requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotations omitted). The factors detailed in 18 U.S.C. § 3553(a) assist the Court in fulfilling this mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985). The sentence recommended in the United States Sentencing Guidelines is only one factor for district courts to consider in making this judgment, and it may not be weighed more heavily than any other § 3553(a) factor. *Gall*, 552 U.S. at 50; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

**A. Mr. Matthews' history and characteristics**

***i. Early Childhood in Hunter's Point***

Kennieth Matthews is one of seven children born to LaKietha Joseph, who struggled to stay afloat as a single mother moving between apartments in public housing in San Francisco throughout Kennieth's childhood. Kennieth's father, Anthony Matthews, has never played a role in his life. He recently completed a lengthy prison sentence. Mr. Matthews remembers the apartments he lived in




with his mother as being chaotic, filled with half-siblings and cousins, and infested with rats and roaches. They lived for his first several years in housing projects in Double Rock, a notoriously dangerous neighborhood in the

shadow of Candlestick Park. The neighborhood is primarily comprised of dead-end streets as well as a notorious intersection, Griffith and Fitzgerald, that police in the 1990's called "the Kill Zone" due to the high homicide rate at this intersection.[1] According to Google Earth, Kennieth's residence at 1027 Fitzgerald was only roughly 289 feet away from this infamous "Kill Zone" as shown in the accompanying graphic. In 1994, the year Kennieth was born, "6 people around Candlestick Park in the Hunter's Point neighborhood were murdered, more than any other single location in San Francisco."[2]

Ms. Joseph moved Kennieth and his siblings frequently and unpredictably. They moved to public housing on Treasure Island for three years before returning to Hunter's Point, where they first lived with Ms. Joseph's mother, then in Section 8 housing on Underwood Avenue. Both residences were in close proximity to the Double Rock area and community violence remained an everyday fact of life for Kennieth.

### *ii. Stability with Godparents in South San Francisco*

Desperate for help, Ms. Joseph asked her great-aunt Johnnie Williams to help to care for Kennieth. Johnnie and her husband Eddie Williams became Kennieth's godparents and they played an invaluable role in Kennieth's early childhood. Mr. and Mrs. Williams had jobs and lived in a comfortable house in a safe working-class neighborhood in South San Francisco far removed from Hunters' Point. They started taking Kennieth to their home on weekends and once he started school they began keeping him during the week and returning him to his mother on weekends. Kennieth became like a younger brother to Mr. and Mrs. Williams' own daughters. When Kennieth was at the Williams' house, he experienced the life that most children should expect: he had two doting parental figures, he did chores, got help with his



**Kennieth with Mr. and Mrs. Williams**

[1] https://www.sfgate.com/news/article/The-kill-zone-3147127.php
[2] *Id.*

homework, and he was provided appropriate clothing and an environment in which he could thrive. His life was still somewhat unsettled, though, because he always knew he was not his godparents' natural son and he would return to his mother's apartment on weekends and during other extended periods.

### *iii. Car Accident and Return to Hunter's Point*

During one of these stints back at his mother's house, Kennieth, who was only ten years old at the time, was involved in a horrific car accident. He was in a car with several of his siblings that was being driven by his aunt. The car flipped, his aunt and sister were ejected from the car, and his aunt, a brother, and a sister died. Kennieth remembers the entire accident, including pulling his unconscious brother from the car. It is difficult to comprehend how overwhelmingly traumatic this incident would have been to a 10-year-old boy. The loss of his siblings was devastating and he



10 yo ♂ in MVA unrestrained backseat passenger in rollover. negative LOC. Extracted from vehicle. Remembers whole incident. Pain (L) leg.



PATIENT CONCERNS/PROBLEMS: Pt is 10 y.o. AA ♂ BIBA post MVA R/O. Eleven other family members were involved in the accident including Pt's 4 yo. brother & 16 y.o sister who were both killed in accident. Pt's 12 yo brother (TR Zula)

FAMILY CONTACT: & 14 y.o. sister were also BIBA to SFGH.

**Excerpts of Kennieth's SF General Medical records after accident**

wrestled with understanding why he had survived whereas his siblings had not. Unable to process his feelings, Kennieth began to act out at school and at home.

When Kennieth was 12 years old, Johnnie and Eddie Williams decided to move to Arizona to care for Mrs. Williams' father, who had been diagnosed with Alzheimer's. Because they were moving to another state and taking on the care of an infirm parent, they did not have the bandwidth to take Kennieth with them. This left Kennieth to return to his mother's home in Hunter's Point, where he was suddenly re-immersed in a world of violence, substance abuse, and poverty. The timing was particularly bad because Kennieth was entering his teens and was still reeling from the death of his

siblings only a year earlier.

Upon returning to Hunter's Point, Kennieth had to harden himself because of the constant violence that surrounded him, both in the neighborhood and inside his own home. He witnessed physical violence between uncles, domestic violence among family members, and he himself was subjected to physical abuse at the hands of his mother. Instead of spending his time thinking about school and extracurricular activities, Kennieth's focus turned to survival. "Researchers know from decades of work that exposure to community violence can lead to emotional, social, and cognitive problems."[3] At 15 years old, he was shot in the leg as he walked to the store. At 23 years old, he was hit by eight bullets in a single incident. Not long after he was released from the hospital, a group of men pulled a gun on him while he was in a laundromat with his mother and siblings. A cousin was murdered on the doorstep of his aunt's home, and shootings were a fact of life in his neighborhood. Given that these experiences were adding to the trauma Kennieth had already experienced associated with the car accident that killed his siblings and aunt, it should come as no surprise that he has been diagnosed with Post Traumatic Stress Disorder.

Scientists have increasingly observed connections between childhood trauma like Mr. Matthews experienced and neurological deficits. There is a growing body of peer-reviewed studies linking Adverse Childhood Experiences (ACEs) with long-term changes in the brain.[4] Mr. Matthews completed an Adverse Childhood Experiences assessment provided by United States Probation during the presentence investigation process in the earlier case. He had experienced 9 out of the 10 possible adverse experiences identified in the assessment, indicating that he faced overwhelming trauma. PSR, ¶ 61. An article in The Atlantic discussed the ACEs research, noting the pioneering work of physicians Anda and Felitti cited above:

---

[3] Saxbe, D. (2018, June 15). *Living with Neighborhood Violence May Shape Teens' Brains*, Scientific American, available at https://www.scientificamerican.com/article/living-with-neighborhood-violence-may-shape-teens-rsquo-brains/

[4] Anda, Felitti, et. Al., *The enduring effects of abuse and related adverse experiences in childhood: A convergence of evidence from neurobiology and epidemiology*, Eur. Arch. Psychiatry Clin. Neurosci. 2006 April; 256(3) 174-1864 (concluding that "the graded relationship of the ACE score to 18 different outcomes in multiple domains theoretically parallels the cumulative exposure of the developing brain to the stress response with resulting impairment in multiple brain structures and functions.").

> Unpredictable childhood trauma has long-lasting effects on the brain. Studies have shown that people with adverse childhood experiences are more likely to suffer from mental-and physical health disorders, leading people to experience a chronic state of high stress reactivity. One study found that children exposed to ongoing stress released a hormone that actually shrank the size of the hippocampus, an area of the brain that processes memory, emotion, and stress management.[5]

Mr. Matthews had his first involvement in the criminal justice system when he was arrested for possessing a weapon at the age of 17. For several years after that, he had a number of arrests and convictions, including some involving violence and possession of weapons.

**B. The nature and circumstances of the offense**

The Court will recall that in his previous case, Mr. Matthews was out of custody and thriving for 2 ½ years between the time of his initial arrest for possession of a firearm and his sentencing in February of 2025. During that time, Mr. Matthews worked and cared for his son Kieth and his mother. Mr. Matthews had full custody of Kieth and they shared an apartment in the Tenderloin. Employment was crucial to Mr. Matthews' transformation. He first worked at Friends of the Urban Forest, a non-profit that plants and cares for trees and sidewalk gardens in San Francisco. Mr. Matthews loved the job and was especially inspired to work with a group of people focused on making his community a better place to live. Mr. Matthews also worked at a security company and for Hertz Rental Cars at the airport to earn enough money to rent his own apartment. In 2023 Mr. Matthews started working as a Community Ambassador for Five Keys. Much of his time was spent working at a shelter serving as a resource to residents, moving between the dormitory, kitchen area, and front lobby. Because he was a single parent to his son, Mr. Matthews worked the night shift, arriving at work at 10:30 p.m. and finishing his shift at 7:00 a.m. Mr. Matthews was regularly required to come to the assistance of overdose victims, he helped to deescalate disagreements and fights among residents, and he came to the assistance of residents manifesting mental health-related symptoms.

Mr. Matthews was also the sole caregiver and provider for his son Kieth and their bond was strong. Mr. Matthews enrolled Kieth at Francisco Middle School and Mr. Matthews was closely

[5] Cindy Lamonthe, *When Kids Have to Act Like Parents, It Affects Them for Life*, The Atlantic, October 26, 2017.

involved with his education, meeting with his teacher and visiting the school to check in on Kieth's progress. He also kept Kieth busy with activities outside school: Kieth loves soccer, basketball skateboarding, and video games. The two had fun creating funny videos together that they posted on Instagram. Kennieth and Kieth had a dog and they spent time walking and playing with him.

After his February 2025 sentencing in the previous case, Mr. Matthews continued to thrive. He was working full time, caring for Kieth, and making plans for the future. He hoped to move out of the area so that he could be free of negative baggage from his youth. The defense provided a positive report to this Court six months after sentencing about Mr. Matthews' continued progress at work, his compliance with all terms of supervised release, and the important role he was continuing to play in Kieth's life.

However, in September of 2025, Mr. Matthews went to Oakland to a First Friday event downtown. First Fridays are a city-sanctioned monthly street festival in Oakland that features artists, food trucks, live music, and performances. Mr. Matthews went on a rare night out to unwind. But gunfire erupted and Mr. Matthews was hit along with several other people. Mr. Matthews had done nothing wrong. He fled, but was hit by multiple rounds from an assault rifle. Two other people were killed and at least three other people were wounded by the gunfire that night. Mr. Matthews was hospitalized for weeks as he recovered from wounds in his thigh and arm. The shooting sent Mr. Matthews into a tailspin. After he was released from the hospital, he was pressured to return to work to keep his position at Five Keys. Still recovering from the shooting, Mr. Matthews was unsteady and weak. Soon after his return, he fell and injured his back, requiring him to again stop working. Kieth was necessarily spending more and more time with his mother because Mr. Matthews was in no condition to care for his son full-time.

The shooting's toll was not only physical. Mr. Matthews struggled with recurring memories of the shooting and he felt extremely unsafe on the streets. Having been victimized repeatedly in the past, Mr. Matthews felt that the only way he could remain safe would be to obtain a firearm. He had no interest in using the firearm against anyone – he had been working for years and caring for his son. But Mr. Matthews was struggling with the trauma stemming from the recent shooting and he made the decision out of fear. He did not have the firearm for long. In February of this year, Mr.

Matthews was inside a convenience store when a man displayed a knife. Concerned that he or someone else in the store could be harmed, Mr. Matthews displayed the firearm he had in his pocket for protection. A recording of the incident shows Mr. Matthews say to the man: "You aint hurting nobody in here and you're not about to get hurt either." PSR, ¶ 6. The man left the store and the situation deescalated. As one would expect, the police were ultimately notified of the incident and Mr. Matthews was later arrested in possession of the firearm. He has remained in custody since his arrest – first at the San Francisco County Jail and now at the Santa Clara County Jail.

### C. Need to Reflect Seriousness of Offense, Afford Deterrence, and Provide Necessary Treatment and Services

A sentence of 18 months' incarceration is sufficient and not greater than necessary to address Mr. Matthews' conduct. Mr. Matthews understands that in his previous case this Court exercised its discretion to impose a non-custodial sentence and that his possession of a firearm was a significant breach of the Court's trust. Mr. Matthews has already spent several months in custody. Particularly given that he is still recovering from the shooting and his back injury, his time in jail has been especially difficult. He has relied upon a wheelchair and a cane at times as he slowly regains mobility. He is trying to make the best of the situation and has sought to take advantage of every available resource to come out a stronger and more resilient person. At Santa Clara County Jail he has completed dozens of online courses on the jail-provided tablet on everything from anger management to parenting and job seeking. He is also thinking about ways to ensure he never again feels the need to obtain a firearm for protection. One is mental health treatment to address his PTSD. Another is trying to move out of the San Francisco area with his wife Tatiana, his son Kieth, and Tatiana's children.

## CONCLUSION

Mr. Matthews will address the Court at sentencing. He is deeply disappointed to be back before this Court after such a long track record of success. He has taken remarkable strides to overcome overwhelming trauma and obstacles thrown at him repeatedly throughout his life. This offense is certainly a major setback that reflects the fact that he still has work to do. He recognizes that his decision to obtain a gun has serious consequences and he has already served several months

in custody as a result. He expects to get back to work upon his release from custody so that he can return to playing a positive role in his son's life and in the lives of everyone around him. The defense asks the Court to impose a sentence of 18 months imprisonment concurrent with a violation sentence on his prior case.

Dated: October 23, 2026

Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

/S

NED SMOCK
Assistant Federal Public Defender